UNITED STATED BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

_____
In Re:                                          )   Chapter 7
     JOANNE N. LUNN,                     )   Case No. 19-11275-MSH
                          Debtor )
_____)
PAULA FRUMAN                                    )
                    Plaintiff   ) ADVERSARY PROCEEDING
                             )    NO. 19-01092
V.                                              )
                             )
JOANNE N. LUNN                                  )
                  Defendant   )
_____ )

## DEFENDANT, JOANNE N. LUNN'S REQUEST FOR FINDINGS OF FACT, RULINGS OF LAW AND TRIAL BRIEF

### I. FINDINGS OF FACT

The Defendant, Joanne N. Lunn, requests that the court make the following findings of fact:

**Jeffrey Fruman and His Businesses**

1. Jeffrey Fruman ("Jeffrey" or "Jeff") grew up in a family that owned a metals business in Stoughton, Massachusetts.  Jeff, who received his JD from Suffolk University, ran three companies in the cable industry: International Cable Company, International Cable Colombia, and International Cable Panama. These three companies tested, refurbished, repurposed and resold new and

1

used cable television equipment.  He also owned a fourth company, Vibrato Networks, which was a software company for cable box technology.

2.      Jeffrey got into the cable business as an offshoot of his family's company B. L. S., Inc., (also known as International Metal Corporation). He gave up some of his stock in that company to become the 100% owner of the cable businesses that he started. Jeff also owned several commercial properties.

**Joanne Lunn**

3.      Joanne Lunn ("Lunn") is 49 years old. Lunn has lived in Raynham all of her life. She has been married to her husband, William, since 1996. After graduating high school, Lunn worked in several office jobs.

4.      After taking three years off to raise her son, she re-entered the work force in 2001 at one of Jeffrey Fruman's companies, International Cable Corporation, in Avon, Massachusetts, as a logistics manager and then as a warehouse manager.

5.      Lunn's duties for Jeffrey's companies continued to expand and, regardless of her job title or the corporate "office" that she held, she basically became Jeff's personal assistant and was considered his "right hand man."  Her responsibilities ranged from sales, to invoicing, to banking, to making his travel arrangements and organizing his personal obligations.

6.      While some of Jeff's companies were based in Florida or in Latin America, Lunn became Jeff's top-ranking employee in Massachusetts. Lunn's corporate title was eventually "Chief of Operations" for International Cable Corp.  The companies that were based outside of Massachusetts each also had their own managers who reported directly to Jeff.

7.      Jeffrey and Lunn were not just business associates; they were also very good friends.  Lunn was an integral part of Jeffrey's work life and was frequently asked to provide help with his personal and family matters.  She had access to his companies' bank records and he consulted with her on most aspects of his business and personal life.

**Paula Fruman**

8.      Paula (neé Torres) Fruman ("Fruman") was born in and currently resides in Colombia. She is the widow of Jeffrey Fruman. Jeffrey and Fruman married on March 4, 2010. They previously met in the Dominican Republic during Jeffrey's first marriage. Fruman was living in the Dominican Republic and working as a model and in television.  In her affidavit she said that they met in 2005, although in a recorded statement in 2013 she said that she had "spen[t] eleven years with Jeff."

9.      Fruman first became involved in Jeffrey's businesses in Latin America.  In 2008, Jeff and Fruman became romantically involved. She started visiting Jeffrey in the United States.

10.     By the end of 2008, she moved from the Dominican Republic to the United States.  Jeffrey was living in Needham, Massachusetts and Fruman moved in with him.

11.     Jeffrey's ex-wife Sara also lived in Needham and Jeffrey and Sara shared parenting time with their children.

12.     When Fruman first came to the United States, she had a tourist visa. She took steps to gain a more permanent status in the United States when she came to live with Jeffrey and after she and Jeffrey married, she applied to be a citizen. However, she did not actually become a U.S. citizen until 2015.

13.     Paula interacted with Spanish speaking customers and with Spanish speaking employees.

14.     Lunn knew Jeffrey's family and at one time also considered his wife Paula Fruman as one of her closest friends.  Lunn and Fruman shared confidences and saw each other socially.  Lunn was also a go-between when Jeffrey and Fruman argued.

**JT Electronics Corp.**

15.    In 2008, Jeff brought to Lunn's attention a business opportunity he was considering.  Comcast was in need of a refurbishing company to handle the cleaning and testing of their cable equipment for its Tracy, California warehouse. This was somewhat different than Jeff's existing businesses, in that it would be strictly a service provider, and not a seller of equipment.

16.    The business opportunity came to a Jeff's attention from his friend Tim Bradley ("Bradley").  Bradley had previously worked for Comcast, until he was laid off.  Jeff and Bradley decided to start a business together to bid on the Comcast contract and created JT Electronics Corp ("JTE").

17.    Jeff and Lunn discussed that there was a better chance of JTE obtaining the contract if it was a Woman or Minority Owned Business Enterprise ("WBE/MBE").  Jeff offered Lunn the role of President of the company and set her to work pulling together all of the pieces.  He asked her to accept the role with a 60% ownership of JTE and he explained to her how it would benefit him.  When JTE originally opened in 2008 it was owned by Lunn (60%), Jeffrey Fruman (15%) and Bradley (25%).  Lunn did not pay anything to become an owner.[1]

---

[1] Attorney Jay Pabian ("Pabian") also testified that it was his understanding that Lunn was an owner of JTE so it could qualify as a woman-owned business.

18.      Although she continued to assist Jeff with his other businesses (and in his personal life), Lunn officially "only" worked for and was paid by JTE after 2010.

**Nicholas Fleming**

19.      Nicholas Fleming ("Fleming") has been a licensed attorney in Massachusetts since 2005. Fleming presently works for Tufts Medical Center, Inc., as a Manager in Grants & Contracts. He was previously in private practice from 2009 until 2016.

20.      JTE was a client of his for several years. In preparing corporate documents for JTE (corporate documents, filings with the Secretary of the Commonwealth, maintaining stock ledgers, etc.) he dealt directly with Jeffrey and Lunn.

21.      Regardless of who was nominally an officer, director or shareholder, Fleming would not make any corporate changes or prepare any documents without instruction or confirmation from Jeffrey and Lunn. To the best of Fleming's knowledge and understanding, the officers, directors and shareholders of JTE were fluid, to suit the needs and convenience of Jeffrey Fruman and the business, as Jeff directed.

22.      Although he took direction from Jeffrey Fruman, there were no transactions or changes in the officers, directors or shareholders of JTE that

Fleming believed were not known or assented to by all the relevant parties at the time.

23.     With regard to any stock transfers, Fleming valued the stock per Jeffrey Fruman's instructions.

24.     Fleming would himself do the electronic filing of documents with the Secretary of the Commonwealth, even when they were purportedly "signed" by an officer of the company.  Fleming was authorized to do so by Jeffrey and/or Lunn.

**Management of JTE**

25.     At no time that she was a shareholder of JTE did Lunn receive distributions, she only received a salary, as set by Jeff, plus commissions. Neither Jeff nor Paula Fruman actually worked for JTE on a day to day basis although they both received a salary.

26.     After their marriage, Fruman did sometimes work for other of Jeffrey's companies, particularly in Latin America, though her salary came from JTE.  In her recorded statement in 2013 Fruman acknowledged "I never work for the company, but Jeff always try to give me cash from different places."

27.     Lunn managed all business aspects of JTE and reported on finances to Jeff, both verbally and in writing, on a weekly basis. Bradley managed its

facility in Tracy, California. On a monthly basis, and again quarterly, Jeff / Paula Fruman's and Bradley's income and distributions were adjusted so that the Fruman's salaries and distributions equaled 75% to Bradley's 25%.

28.     Jeff made all decisions on how much money was paid out to himself, Fruman and Bradley, as well as Lunn's salary.

**Changes in Ownership of JTE**

29.     After two years, Lunn grew concerned about her ownership of 60% shares in the company.  The company was showing a profit, and all distributions were actually going to Jeff, Bradley and Fruman.

30.     Much of the companies' net income was already being diverted to Jeff in the form of an intellectual property licensing agreement.  However, Lunn still incurred a tax liability as a result of her ownership of the stock.  The company's accountant, Larry Leiberfarb also prepared Lunn's personal taxes.

31.     He would prepare Lunn's personal taxes as if she did not own stock in JTE and the company would reimburse any tax liability that resulted from Lunn's nominal ownership.

32.     By now Jeff and Fruman had married.  Jeffrey arranged for her a conveyance of a majority interest in JTE to Fruman. At various times, Fruman was Secretary, Vice President and a Director of JTE. Lunn readily agreed to put the company in Fruman's name, thinking this would allow the company to

8

still benefit of being female/minority owned.   Fleming, drew up the documents.

33.     On paper, Lunn "sold" her 600 shares of JTE to Fruman for $8,000. No consideration however was actually paid to her.  Lunn continued in her role as President, to run the day-to-day operations of the company, after the transfer to Fruman.  Her salary and compensation never changed.   At that same time, Jeff had also gifted 10% of his shares of JTE to Bradley and gifted his 5% remaining shares to Fruman.  Once these transfers were completed, Fruman owned 65% and Bradley owned 35%.

34.     Businesswise, nothing changed.  Jeff, and Bradley remained the two people receiving distributions from profit, with Lunn running the day-to-day business operations.  The vast majority of JTE's profits were still generated by the Comcast refurbishing contract in California.

35.     When Fruman began working for JTE, she was paid $4,000 every other week.  Eventually, the amount she was paid increased to $5,000 every other week.

36.     Lunn thought that with Paula Fruman as the majority owner that JTE would still qualify for the woman/minority owned business status because she was a female.

37.    However, in late 2011, JTE was asked by Comcast to complete the process of becoming a certified WBE/MBE company by getting certification through one of several qualifying companies. Up until this time Lunn thought that Comcast had already accepted JTE since they had awarded them the work. Lunn became aware that there were other factors involved.  Comcast provided a list of companies that could "certify" JTE as a woman-owned business.

38.    Lunn contacted The Greater New England Minority Supplier Development Council and submitted the application for JTE with Fruman as the owner.   They rejected the application because the female majority shareholder had to be a United States citizen in order to qualify. At the time, Fruman was not yet a U.S. citizen.   Fruman acknowledged this in her testimony that U.S. citizenship was a requirement for certification.

39.    Even if Fruman had been a citizen, Lunn also learned that the female owner would also have to be the person managing the company.  Paula was not managing the company; Lunn was.

40.    In order to qualify, the "female owner" would be subject to an on-site inspection and interview, to confirm that she handled more than 51% of the customers, vendors and day to day operations, etc.   In addition, to earn certification the company would also have to prove the owner's ability and history in the cable industry and the qualifications to run the business.   JTE

10

could never have met these requirements in 2011 or 2012 with Fruman as the owner.

41.     For the company to qualify, Lunn would have to return to the majority ownership of the shares.

42.     In 2012 there was also an additional reason for Lunn to nominally be the owner of JTE. Jeff and Fruman owned another separate cable business called International Cable Company Colombia ("ICC Colombia") which operated a cable testing facility in Bogota, Colombia.  This company's function was to provide refurbishing services to Telmex Corp. (its only customer), which owned telephone, cable and internet companies throughout Central and South America.  There were also minority shareholders, who were unrelated to Jeff and Fruman, who lived in Colombia.

43.     In early 2012, ICC Colombia lost its contract with Telmex and had litigation with the other owners.  Fruman acknowledged this in her testimony.

44.     Jeff had a plan to win back the business by submitting a bid with Telmex under JTE, with Lunn's name as owner of the company.  That way Telmex would not see the Fruman name on the contract.  Fruman acknowledged this in her recorded statement in March of 2013.

45.     Since Jeff expected to win the Telmex contract and regain the profits he did think that Bradley should share in them since he had never been

involved in that aspect of his businesses.  Therefore he also prepared to buy Bradley out of the company.

46.     There are emails back and forth between Fleming, Jeff, Bradley, Fruman and Lunn regarding the transfer documents, including Fruman manifesting her consent.   To the best of Fleming's knowledge and understanding at the time of the transfer, the conveyance of stock from Fruman to Lunn in February of 2012 was done with the knowledge and consent of all parties concerned.

### Further Changes in JTE's Ownership

47.     The Frumans encountered difficulties in their marriage. Joanne always wanted Jeffrey and Fruman not to argue. However one such argument occurred in early 2012. Fruman went to Colombia to be with her extended family that lives around Periera, Colombia. While she was separated from Jeffrey for at least several days, Jeffrey cut off her credit card, her phone and her salary from JTE.

48.     In early March 2012, Lunn arranged for Jeffrey and Fruman to meet in Cartagena, Colombia. Joanne made the travel arrangements for Fruman to go to Cartagena.

49.     Nick Fleming again drew up and completed all of the paperwork to transfer the stock back to her. Lunn did not pay anybody any money for the

stock, nor was she asked to.  She sent Jeffery documents prepared by Fleming to effectuate Fruman's stock transfer to Lunn and Jeffery returned with them signed.

50.     The Frumans' temporary separation lasted for a short period of time and they reconciled.  By May of 2012 Jeffrey even conveyed his personal residence in Needham to himself and Fruman.  Fleming drafted this document for them.

51.     Certification as a WBE was awarded after the CPUC completed all due diligence required.  This resulted from Lunn owning at least 65% of shares. The other 35% shares were owned by JTE, as the company had purchased Bradley's shares, so at least on paper Lunn owned 100% of the company.

52.     On June 13th of 2012, Jeff Fruman sent Lunn an email titled "your salary/incentive and your job."   This email detailed what Jeff proposed Lunn's compensation package should be.  She strongly disagreed with Jeff about this email, not due to her own compensation but what she perceived as unrealistic expectations of compensation to Jeff and Fruman.

53.     Lunn no longer wanted ownership of JTE. She sold the company back to Jeff the following day.

54.     This also coincided with attempts for JTE to get a line of credit from Webster Bank.  Jeff had asked Lunn, while she was still the owner of JTE, to

open a bank account and seek to obtain a line of credit for JTE through Webster Bank so that he would be able to use those funds. He explained that he had about $1,000,000.00 in Apple stock, but that they were in his E-Trade account and he did not want to liquidate or risk those shares for an investment. He would prefer to borrow the money against JTE.

55.     Lunn applied for a line of credit totaling $500,000.00 at Jeff's request. Webster Bank denied the loan.

56.     Jeff had Fleming create documents which sold the company back to him in hope of securing the line of credit from Webster, using Jeff, and his income, credit and assets.    At that time, Jeff did not actually pay Lunn $10,000.00. She remained as President and continued running his business.

57.     To the best of Fleming's knowledge and understanding, Lunn conveyed her shares to Jeffrey Fruman in June of 2012. Therefore, to the best of Fleming's knowledge and understanding, Jeffrey Fruman was the owner of 100% of the stock in JTE at the time of his death.

58.     Several months later, not contemporaneously with the stock transfer, Jeff gave Lunn a check for $10,000.  There had been no simultaneous discussion when Jeff handed her the check, which she understood to be her holiday bonus.  Lunn thanked Jeff as if it had been a bonus, not money he

14

"owed" her. Sometime after Jeff's death, Lunn realized that he had indicated on the memo line of that check that it was for the purchase of the stock.

59.     In September of 2012, Jeff Fruman borrowed $100,000.00 from JTE in order to pay his and Paula Fruman's personal taxes.  Jeff had promised to repay the $100,000 to JTE in January of 2013.

60.     JTE never received the anticipated profits from ICC Colombia as JTE was not awarded the Telmex contract.

**Jeff Fruman's Death**

61.     Jeffrey Fruman died unexpectedly while on a business trip to Hong Kong on March 12, 2013. Fruman was with her family in Colombia when she learned that had happened. It was Lunn who called to tell Fruman.

62.     Jeffrey's Will named his estate planning attorney, Jay Pabian ("Pabian") and Jeffrey's cousin, Todd Kamens, as the personal representatives or "estate managers."

63.     They tried to run Jeffrey's companies, however  Jeffrey's death threw his businesses into turmoil.  His overseas companies closed.  The former CEO of ICC Miami, Edmerson Vazquez, left the company and opened a competing business.   Consequently, this business basically took over from ICC by servicing the same customer base and hiring away the majority its employees, without any compensation to the Estate.

15

64.     After that occurred, Lunn in cooperation with Jeff's father, tried to set up a company that could do the same thing (though on a smaller scale) as ICC Miami did.  They called it JFK Communications, LLC (which stood for "Jeff Fruman's Kids") as they hoped it would be a benefit to them.

65.     JFK did not compete with JTE.  It purchased some of the stock from the then-bankrupt ICC Miami in the hopes of reselling it for a profit.  In fact it loaned money to JTE and paid some of its debt.  Fruman has not alleged or proven any damages as a result of the formation of JFK.

66.     The service contract that JTE had with Comcast in California was abruptly cancelled in April of 2013 (one month after Jeff's death) because Comcast contracted with a management company to take over their California hub that had been sending JTE the business.  The new management company did all of their own refurbishing.  This resulted in JTE losing 95% of its business overnight.

67.     This came as a surprise to Lunn as Comcast had first advised in December of 2012 that there was a possibility that could happen, but she expected it would take another 12-18 months for the transfer of management to be complete.

68.     JTE's California warehouse and refurbishing facility went out of business by June of 2013 and all of JTE's workers there were laid off.

69.      There was some confusion over the ownership of JTE.  Although the parties had signed papers transferring the stock, Lunn was still listed as the President and sole director with the Secretary of State.

70.      In May of 2013 Fruman (and Sara Fruman) filed documents with the Secretary of State indicating that they were the officers and directors of JTE.

71.      In response, for a short time, Lunn through her then-attorney asserted that she was the owner.  However, when it was pointed out to her that Jeffrey had, in fact, issued a check for the $10,000 referenced in June 2012 stock transfer  agreement (albeit 5 months later), she conceded that Jeffrey, and therefore now his estate, was the owner.

**Fruman's Law Suit**

72.      Fruman alleged that as a result of the June 13 email from Jeff to Lunn, Lunn had agreed to continue to pay Paula $5,000 every two weeks.  She further alleged that she never agreed to sell her shares to Lunn in 2012.  As a result, she sued Lunn.

73.      Simultaneously she sued Pabian and others over advice that they had given Jeffrey which resulted in him not having life insurance coverage at the time of his death.

**JTE's Operations after Jeffrey's Death**

74.      With the loss of the Comcast contract and the September 2012 loan of $100,000 to Jeff Fruman -- and without the Webster Bank loan and the Telmex contract -- JTE could not financially recover.

75.      The Estate could not contribute any money to help run or save the company.  Lunn attempted to leave JTE and forfeit any claim of ownership of the company in July of 2013.  Despite this turmoil, the estate managers requested that Lunn stay as President and continue to run JTE.  In July of 2013, they presented her with a Management/Employment agreement which she signed.

76.      As much as Lunn wanted to walk away, she feared that she would be the person who was held financially responsible for the debt of JTE because she was still the President and had signed some personal guaranties.  She further felt loyalty to Jeff Fruman's estate and family, and especially Jeffrey's children, and tried to turn the business around.

77.      In regards to Bradley's sale of 35%, Jeff had made one payment of $100,000 to Bradley when the paperwork was signed.  Jeff had agreed to pay Bradley the remaining $127,000 by making two payments of $63,500 each. One payment of $63,500 was made to Bradley in October of 2012.  The final payment of $63,500 was due to Bradley on February 15th of 2013.   Jeff was

unwilling or unable to make that payment and died before the final payment to Bradley was made. After Jeff's passing, JTE made several smaller payments to Bradley, which totaled $25,800. Lunn was then instructed by the estate managers to stop sending payments to him. Bradley was never paid the final $37,700.

78.     The reason that JTE also stopped making payments to Paula was that there was no money to do so. In a meeting on April 24th 2013 in the company office, Lunn explained JTE's finances. The company was $300,000 in debt due to monies owed to vendors, monies borrowed by Jeff ($100,000) and monies paid to Bradley on Jeff's behalf. In addition, the company had also just paid out many thousands of dollars for Jeff's funeral expenses, memorial books, air-fare to fly people into the United States and for personal expenses such as the services, hotel rooms etc.

79.     Fruman testified herself that "of course" JTE could not continue to pay her $5,000 bi-weekly salary after it lost the Comcast contract.

80.     Eventually, all of Jeff's companies closed and International Cable Corp. filed for bankruptcy.

81.     Fruman never attempted to work at JTE after Jeffrey's death, nor did she assert any claim against the estate or estate managers that she was the

owner of JTE nor sue the estate, its managers or JTE for the cessation of her bi-weekly compensation.

82.    There was no fraudulent or malicious activity by Lunn that prevented payments from being made to Paula; just the economic reality of the situation. The estate managers eventually specifically told Lunn not to pay Fruman (as they did with Bradley). Lunn did paid Fruman when she was instructed to do so after Jeffrey's death.

83.    Any of the changes to or representations of the ownership of JTE to third parties were at Jeff Fruman's direction and to serve the needs and exigencies of the business, and ultimately Jeff's financial interest and plans. Lunn never made any false representations about her or Jeff's ownership directly to Fruman.

84.    Lunn herself never obtained any money from Paula.  When JTE continued to pay Fruman $5,000 biweekly after her "sale" of the stock to Lunn, it was at Jeff's direction because that was one way for the Fruman's to take money out of the company.  Lunn had no say in whether to make these payments during Jeff's lifetime.   After his death, she tried to honor those wishes because so many other sources of Jeff and Paula's income had dried up. Ultimately JTE could not afford to pay Fruman and, at the estate managers' direction, JTE stopped.

85.     Lunn tried to keep JTE running, which ultimately would have benefited the Estate and therefore Fruman.  This proved impossible, for reasons beyond her control.   The stock turned out to be worthless, despite Lunn's efforts to salvage the company.

86.     Lunn left JTE in or about October of 2014.  She was advised that Larry Richardson would be filing bankruptcy for the company.

**The Judgment against Lunn**

87.     In 2013, Fruman brought suit in Suffolk Superior Court, C.A. No. 1384CV02976, against Pabian, his firm and Lunn.  Pabian settled.

88.     At trial in the Superior Court, Lunn represented herself. She was called as  a witness and testified but presented no evidence of her own because she and Jeff did not have what she considered to be a "contract;" just an email conversation in which she rejected Jeff's proposal and ultimately gave him back the company.  Lunn believes that the entire June 13, 2012 email chain was not shown to the jury.

89.     After a full trial, the verdict reached by the jury determined that there was a breach of fiduciary duty by Lunn to Fruman which caused Fruman damages amounting to $10,000.

90.     All of the remaining damages in the amount of $350,000 was allotted by the jury to the breach of contract claim.

91.    The jury decided that Lunn did not cause any intentional infliction of emotional distress and therefore found no damages for that claim.

92.    On April 17, 2019, Lunn filed this case as a Chapter 13 Bankruptcy. On May 2, 2019, Lunn filed a Motion to Convert Case From Chapter 13 to Chapter 7 which was allowed by Judge Feeney on May 3, 2019.  The Fruman judgment in the amount of $514,369.00 is included on my Schedule E/F as an unsecured claim.

93.    It is difficult to give much weight to Fruman's testimony by affidavit where it contradicts Lunn's.   There were numerous errors in Fruman's affidavit.  "Colombia" is misspelled throughout and there was an indication that she obtained a "finance" visa, rather than a fiancée visa.   More significantly it was incorrect as to the stock transfers that occurred among Jeff, Fruman Bradley and Lunn in 2010 as well as that Bradley was, in fact, an original owner of the company in 2008, not added in 2010.  As such, it does not appear to have been carefully reviewed or prepared by Fruman who, at trial, testified that she was aware of at least some of these errors, but never sought to correct them.

95.    Although not alleged in her original, first or second amended civil complaints against Lunn, Fruman at some point alleged that Lunn gave her some documents and later "stole" them back from her.  Whereas Lunn both

denies this and Fruman cannot testify as to the exact nature of those documents, this court can give no weight to the allegations.

## II. RULINGS OF LAW

The Defendant, Joanne N. Lunn, requests that the court make the following rulings of law:

1.      In an action for determination of dischargeability under Section 523(a), the plaintiff has the burden of proving all elements of the claims for relief asserted by a preponderance of the evidence. *In re Dakota*, 284 B.R. 711, 721 (Bkrtcy. N.D. Cal., 2002) (citing *Grogan* v. *Garner*, 498 U.S. 279 (1991)).

2.      The exceptions to discharge set forth in Section 523(a) are to be construed narrowly. Id. (citing to *In re Risoi*, 978 F.2d 1151 (9th Cir. 1992)).

3.      The Bankruptcy Code does not condition discharge upon a generalized determination of the moral character of the debtor. Instead, it specifies the types of debts that the Code deems exempt from discharge. *McCrory* v. *Spigel* (*In re Spigel*) 260 F.3d 27, 31 (1st Cir. 2001)

4.      To prove the non-dischargeability of a debt arising from false pretenses, false statements or actual fraud under 11 U.S.C. 523 (a)(2)(A), the Creditor must first prove that the Debtor obtained money, property or services from the Creditor.  11 U.S.C. 523 (a)(2).

5.      Further to prove the non-dischargeability of a debt arising from false pretenses, false statements or actual fraud under 11 U.S.C. 523 (a)(2)(A) the Creditor must prove the Debtor:

      a.)      made a representation;

      b.)      which the Debtor knew at the time that the representation was false;

      c.)      the representation was made with the intention and purpose of deceiving the Creditor;

      d.)      the Creditor justifiably relied on the Debtor's representation;

      e.)      and the Creditor sustained damage as the proximate result of the Debtor's representation.

***In re Apte***, 96 F.3d 1319, 1322 (9th Cir. 1996); ***In re Kirsh***, 973 F.2d 1454, 1457 (9th Cir. 1992).

6.     The statutory language does not remotely suggest that nondischargeability attaches to any claim other than one which arises as a direct result of the debtor's misrepresentations or malice. ***Kun Zhao*** v. ***Lauzon (In re Lauzon)***, Case No. 10-10641-JNF (Bankr. D. Mass. Apr. 9, 2012) quoting ***Century 21 Balfour Real Estate***, 16 F.3d at 10.

7.     To prove non-dischargeability of a debt under Section 523(a)(4) the Creditor must prove:

> a.) there existed an express trust between the Debtor and Creditor;
>
> b.) the debt was caused by fraud or defalcation by the Debtor; and
>
> c.) The Debtor was a fiduciary to the Creditor at the time the debt was created.

*In re Niles*, 106 F.3d 1456, 1459 (9th Cir. 1997).

8.     To prove non-dischargeability of a debt under 11 U.S.C. 523(a)(6), the Creditor must prove:

> a.) the Debtor committed a wrongful act;

b.) done intentionally with a subjective motive to inflict injury to the Creditor;

c.) without cause or excuse;

d.) which necessarily caused an injury;

e.) that the Debtor believed that injury was substantially certain to occur as a result of her conduct;

f.) the Debtor's debt to the Creditor arose from such conduct.

9.    For injury to be "willful," within meaning of dischargeability exception, debtor must cause an injury that is deliberate or intentional, not merely engage in deliberate or intentional act that leads to the injury. *Liddell* v. *Peckham* (*In re Peckham*), 442 B.R. 62, 77 (D. Mass. 2010)

## III. TRIAL BRIEF

Fruman's dischargeability claims against Lunn essentially arise from two issues. First, that Fruman did not continue to receive the $5,000 bi-weekly payments after her husband's death and second that she did not agree to sell her interest in JTE to Lunn in 2012 and claims that she was not aware that her shares were purportedly conveyed to

Lunn until after her husband's death.   While there was substantial evidence presented at the trial of these that neither of these issues actually created a "debt" to Fruman from Lunn, Fruman nevertheless does have a judgment against Lunn as a result of a Superior Court jury trial.   Based on the totality of the evidence presented at trial in this court however, that judgment is subject to discharge.

Fruman alleges that Lunn herself is personally responsible for damages her due her failure to continue to receive her bi-weekly payment after Jeffrey's death.   She was even able to convince a jury that Lunn herself breached a "contract" that arose from Jeffrey's June 13, 2012 email to Lunn.   Apart from the Superior Court judgment itself, there is a paucity of under that Lunn even agreed to make these payments.   Moreover, the payments had always come from JTE, not Lunn personally. [2]   Fruman even acknowledges that the dramatic downturn in JTE's finances due to the loss of its Comcast contract made these payments impossible.   Finally, Lunn conceded that she was *not* the owner of JTE. During Jeffrey's lifetime she took direction whether and

---

[2] If they had come from Lunn personally, they would have been equivalent to Lunn's entirely salary.

27

how much to pay Fruman, and after his death took direction from the estate managers, just as she had taken direction from them concerning other aspects of JTE's finance.

Even if, *arguendo*, Lunn had promised that Fruman would continue to receive these payment, she did not promise that to Fruman. She also would not have promises it falsely at the time with an intrent to deceive at that time, as she would have thought that JTE would have the continued ability to make the payments.  She could not possibly have foreseen Jeffrey's death and the loss of the Comcast contract at that time. Likewise, she could not have foreseen JTE's loan to Jeffrey that was never repaid, the payment of Fruman's non-business related expenses, the failure to obtain the work that ICC Colombia lost, and, no doubt the effects on JTE created by all of the contentious issues among Paula Fruman, Sara Fruman, Jeffrey's family, the Estate Managers and Lunn.  Additionally, the very next day she gave the company back to Jeffrey, so she had no ultimate authority or fiduciary capacity to make the payments. Whatever a $350,000 breach of contract judgment arising

from Jeffrey's June 13, 2012 email to Lunn meant, it is certainly subject to discharge and not exempted under any provision of the Code.

Fruman's second issue arises from what she would claim is her signature being fraudulently affixed to the stock transfer documents. This would appear to be the genesis for the $10,000 jury verdict on the breach of fiduciary duty claim, as Lunn did receive $10,000 from Jeffrey for the stock that she – following Fruman's logic – did not own. There is no allegation that Lunn was the one who affixed her signature to the stock transfer document and, if Fruman is to be believed, it was Jeffrey himself.  In fact, Fruman did not even meet her burden of proving that Lunn knew it was, arguably, forged.  There were, of course, legitimate business reasons why it was in Jeffrey (and Paula) Fruman's best interest for Lunn – and not Paula Fruman – to be the owner of JTE. Fruman acknowledging that the minority owner woman had to be a U.S. citizen (which she was not at the time) and that she and Jeffrey wanted to keep the Fruman's name off JTE in an attempt to win back the Telmex contract in Colombia.  Further, Lunn never misrepresented Fruman's continued ownership after 2012.  The only person to whom

Lunn might have made a misrepresentation of Lunn's continued ownership (after her June 2012 conveyance to Jeffrey) was to Charter in an effort to win a contract. Charter, nevertheless, chose not to do business with JTE and Fruman suffered no damages. Lunn never specifically misrepresented her ownership to Fruman and her contention after Jeffrey's death that she was the owner was short-lived and ultimately irrelevant.

Even if Fruman was somehow duped out of her JTE stock by her husband to whom Lunn was complicit, what did she actually lose? She continued to receive her bi-weekly payments for as long as possible from a company that was doomed to failure a month after her husband's death -- and of which she still owned in part, as an heir of his estate.

It is somewhat telling that even in the Spring of 2013 when she did file suit, Fruman never sued Lunn or the Estate to get back the stock in "her" company; she only sued Lunn for damages. Further she never sued JTE, the Estate or its managers due to the cessation of her $5,000 payments -- as clearly this would have been futile.

At first blush, it might appear that Lunn's cooperation with Larry Fruman to form JFK may have somehow breached a fiduciary duty to Paula Fruman (or at least JTE). However Lunn's credible and unrebutted testimony was that it was done in a failed effort to recapture some of ICC Miami's lost business in Florida; it was not a competitor of JTE (which would not have had the money to move forward in a new venture anyway) and that ultimately JFK provided at least a small benefit to JTE by loaning it money and/or helping to pay its expenses, when no one else did. Fruman also failed to prove any actual damages arising from Lunn's formation of JFK.

Lastly, despite there contentions after Jeffrey's death, there was no evidence which saw that Lunn acted in a willful or malicious manner towards Fruman. In fact the jury found that there was no intentional infliction of emotion distress, nor has Fruman proven any discernible damages arising from an intentional tortious act.

## IV. CONCLUSION

The court should enter judgment in favor of the Defendant, Joanne N. Lunn on each count of the Plaintiff, Paula Fruman's complaint objecting to the discharge of Lunn's debt to Fruman and accordingly enter a discharge order in Lunn's Chapter 7 bankruptcy case.

Respectfully submitted,
Joanne N. Lunn,
By her Attorneys,

*/ s / John E. Zajac*

_____
John E. Zajac, Esquire BBO #560195
CORNERSTONE LAW GROUP, LLC
One Taunton Green, Suite 2
Taunton, MA 02780
(508) 821-2552
jezesq@cs.com

## CERTIFICATE OF SERVICE

I, John E. Zajac, do hereby certify that on March 12, 2021, I served Defendant, Joanne N. Lunn's Request for Findings of Fact, Rulings of Law and Trial Brief to the Clerk of the Bankruptcy Court and via CM/ECF upon the parties who have filed notices of appearance in the Court's CM/ECF database.

Peter J Duffy
pduffy@psdfirm.com

Honoria DaSilva-Kilgore
hdklaw@hdklawoffices.com

*/ s / John E. Zajac*
_____
John E. Zajac, Esquire BBO#560195
CORNERSTONE LAW GROUP, LLC
One Taunton Green, Suite 2
Taunton, MA 02780
(508) 821-2552
jezesq@cs.com