**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| In re:<br><br>**JOANNE N. LUNN,**<br><br>Debtor<br><br>**PAULA FRUMAN,**<br><br>Plaintiff<br><br>v.<br><br>**JOANNE N. LUNN,**<br><br>Defendant | Chapter 7<br>Case No. 19-11275-JEB<br><br><br><br><br>Adversary Proceeding<br>No. 19-01092-JEB |

**MEMORANDUM OF DECISION**

This matter came before the Court on the Complaint filed by the Plaintiff, Paula Fruman, against the Defendant and Debtor, Joann N. Lunn. Pursuant to the Complaint, the Plaintiff seeks a determination that the debt owed by the Debtor to her is nondischargeable pursuant to Section 523(a)(2)(A), Section 523(a)(4), and Section 523(a)(6) of the Code. For the reasons set forth below, the Court finds that the debt of the Debtor to the Plaintiff is discharged.

This Memorandum of Decision constitutes the findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a), made applicable to this proceeding by Fed. R. Bankr. P. 7052. The findings set forth in this Memorandum are based on the record as a whole and may be supported by testimony and exhibits that are not specifically cited. Any finding of fact deemed a conclusion of law is adopted as such, and vice-versa. Findings of fact may also be set forth in the Analysis section in connection with the application of the law.

**PROCEDURAL BACKGROUND**

On April 17, 2019, the Debtor commenced bankruptcy proceedings under Chapter 13 of the Code. On May 3, 2019, the case was converted to a case under Chapter 7 of the Code. The Plaintiff commenced this adversary proceeding on August 9, 2019. The Debtor was granted a discharge of all other debts on August 19, 2019.

Prior to the commencement of the bankruptcy, as more fully discussed below, the Plaintiff obtained a judgment against the Debtor in state court. The Plaintiff alleges that the debt owed by the Debtor is nondischargeable under Section 523(a)(2) based on actual fraud and false representations by the Debtor to obtain the Plaintiff's ownership interest in a closely held corporation, JT Electronics Corp ("JTE"). She also alleges that the debt is nondischargeable under Section 523(a)(4) because there was a "defalcation" by the Debtor as an officer of JTE resulting in the destruction of JTE and the loss to Plaintiff of the benefits from JTE. Finally, the Plaintiff alleges that the debt was nondischargeable under Section 523(a)(6) due to "willful and malicious" actions of the Debtor to injure the Plaintiff through the loss of her ownership in JTE and the destruction of the value of JTE.

After discovery, the Debtor filed a motion for summary judgment, which was denied by the Court. The parties submitted a Joint Pretrial Memorandum which set forth certain stipulated facts and narrowed the issues of law and fact.

The Court conducted an evidentiary trial by video on January 11, 2021, January 12, 2021, and January 13, 2021. By agreement, direct testimony was submitted by way of affidavit, with additional direct testimony at trial and the opportunity for cross-examination. In addition to the foregoing evidence, 105 exhibits were admitted at trial.

**JURISDICTION**

The Court has jurisdiction over the Complaint since it arises under Section 523 of the Bankruptcy Code. 11 U.S.C. § 523. Pursuant to Section 1334(b) of title 28, the district courts have jurisdiction of "all civil proceedings arising under title 11, or arising in or related to cases under title 11," subject to exceptions not applicable here. 28 U.S.C. § 1334(b). By a standing order of reference in accordance with 28 U.S.C. § 157(a), the district court in this district has referred all cases under title 11 and any proceedings arising under, arising in, or related to cases under title 11, to the bankruptcy court. *See* 28 U.S.C. § 157(a). The determination of the dischargeability of a debt is a core proceeding in bankruptcy. 28 U.S.C. § 157(b)(2)(I). Accordingly, this Court may hear and finally determine this matter.

**APPLICABLE LAW AND BURDEN OF PROOF**

Section 523(a) of the Code sets forth the debts that are excepted from an individual debtor's discharge. 11 U.S.C. § 523(a). Consistent with the "fresh start" policy of the Code, exceptions to a debtor's discharge are narrowly construed. *In re Stewart*, 948 F.3d 509, 520 (1st Cir. 2020). The creditor bears the burden to show that the debt "comes squarely within" an exception. *In re Spigel*, 260 F.3d 27, 32 (1st Cir. 2001). The standard of proof is a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 291, 111 S. Ct. 654, 661 (1991).

**Section 523(a)(2)**

Section 523(a)(2)(A) excepts from discharge "any debt . . . for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud[.]" 11 U.S.C. § 523(a)(2)(A). Each of the three categories – false pretenses, false representation, and actual fraud – are separate types of misconduct, although they have overlapping elements. *In re Curran*, 554 B.R. 272, 284–85 (B.A.P. 1st Cir.

3

2016), *aff'd*, 855 F.3d 19 (1st Cir. 2017).

To prevail on a claim for false representation, the creditor must demonstrate the following elements:

> 1) the debtor made a knowingly false representation or one made in reckless disregard of the truth, 2) the debtor intended to deceive, 3) the debtor intended to induce the creditor to rely upon the false statement, 4) the creditor actually relied upon the false statement, 5) the creditor's reliance was justifiable, and 6) the reliance upon the false statement caused damage.

*In re Stewart*, 948 F.3d at 520 (further citations omitted). Each of the elements must be proven, or the creditor will fail to prevail. *Palmacci v. Umpierrez*, 121 F.3d 781, 787-88 (1st Cir. 1997). False pretenses requires the same six elements, except that the false representation is replaced by an "implied misrepresentation or a false impression created by conduct of the debtor." *In re Curran*, 554 B.R. at 285 (further citations omitted).

Actual fraud is broader in scope and construed in light of the traditional common law definition. *In re Stewart*, 948 F.3d at 521. It "consists of any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another[.]" *In re Lawson*, 791 F.3d 214, 219 (1st Cir. 2015) (further citations omitted). It requires wrongful intent and cannot be implied by law. *In re Stewart*, 948 F.3d at 521.

Fraudulent conveyances which involve actual intent to hinder, delay or defraud creditors are included within the scope of actual fraud, even though there may be no fraudulent representation. *See Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355, 366, 136 S. Ct. 1581, 1590 (2016). As a result, the recipient of a fraudulent conveyance who participates with the requisite intent may be liable to a creditor if the debt is "traceable" to the transfer. *Id.* at 365. But the Supreme Court in *Husky* did not eliminate the requirement that the debt be "obtained by" or traceable to the fraud. *In re Gaddy*, 977 F.3d 1051, 1057 (11th Cir. 2020). A subsequent

4

fraudulent conveyance does not convert an existing debt that is otherwise dischargeable into a nondischargeable debt. *See id.* at 1058.

**Section 523(a)(4)**

Section 523(a)(4) of the Code excepts from discharge debts arising from "fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny." 11 U.S.C. § 523(a)(4). Each of the categories in Section 523(a)(4) requires a showing of requisite intent.

Section 523(a)(4) encompasses debts arising from "embezzlement" and "larceny." Embezzlement under Section 523(a)(4) requires that the creditor show "that the debtor converted another's property in his lawful possession with fraudulent intent," *In re Sherman*, 603 F.3d 11, 13 (1st Cir. 2010). Larceny encompasses acts involving the "fraudulent and wrongful taking of the property of someone else with the intent to appropriate it to the taker's use and to deprive the owner of such property." *In re Ansin*, 667 B.R. 760, 769 (Bankr. D.N.H. 2025).

Section 523(a)(4) also deals with debts arising from actions by a debtor as a fiduciary. For purposes of Section 523(a)(4), whether the debtor was acting in a fiduciary capacity is determined under federal law. *In re Fahey*, 482 B.R. 678, 688 (B.A.P. 1st Cir. 2012). The concept of fiduciary under Section 523(a)(4) is narrowly construed. *In re D'Abrosca*, No. ADV 09-01070-ANV, 2011 WL 4592338, at *5 (B.A.P. 1st Cir. Aug. 10, 2011). It includes only fiduciary relationships arising under an express or technical trust, but not those arising under a trust imposed by law. *Id.*

For debt obtained by fraud by a fiduciary, a creditor must show fraudulent intent, similar to the requirements under Section 523(a)(2). "Defalcation" requires a breach of fiduciary duty. *In re Baylis*, 313 F.3d 9, 17 (1st Cir. 2002). It includes the inappropriate use of trust funds or money held in a fiduciary capacity. 2 Bankruptcy Law Manual § 8:9 (5th ed.) (citations omitted.) It also

5

can arise from a breach of the duty of loyalty, which requires a fiduciary to act in the beneficiaries' interest when in conflict with the fiduciary's own interest. *In re Baylis*, 313 F.3d at 20.

But not every breach of fiduciary duty gives rise to a nondischargeable debt. To prevail, a creditor must also show that the debtor had a "culpable state of mind," similar to embezzlement, fraud, and larceny. *Bullock v. BankChampaign, N.A.,* 569 U.S. 267, 269, 133 S. Ct. 1754, 1757 (2013). An act of defalcation under Section 523(a)(4) requires a state of mind that includes "knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior." *Id.* "A defalcation must involve either (i) moral turpitude, bad faith, or other immoral conduct, or (ii) in lieu of these, an intentional wrong, which includes not only conduct that the fiduciary knows is improper but also reckless conduct of the kind that the criminal law often treats as the equivalent, such as where the fiduciary consciously disregards, or is willfully blind to, a substantial and unjustifiable risk that his conduct will turn out to violate a fiduciary duty." *In re Ackerman*, 587 B.R. 750, 786 (Bankr. D. Mass. 2018) citing *Bullock v. BankChampaign, N.A.*, 569 U.S. at 273–74, 133 S. Ct. at 1759–60.

**Section 523(a)(6)**

Section 523(a)(6) excepts from discharge any debt for "willful and malicious injury" by a debtor to another entity. 11 U.S.C. § 523(a)(6). To prevail, the creditor must prove that the act resulted in both "willful" and "malicious" injury.

"Willful" under Section 523(a)(6) requires that the creditor show a "deliberate or intentional *injury,* not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998) ("*Geiger*") (emphasis in original). The creditor must show that the debtor intended "'the *consequences* of an act,' not simply 'the act itself.'" *Id*. at 61-62 (citing

6

Restatement (Second) of Torts § 8A, Comment *a,* p. 15 (1964)) (emphasis in original). Reckless or negligent injuries do not fall within Section 523(a)(6). *Id*. at 64. "Willfulness" also includes acts that a debtor knows with substantial certainty will result from his act. *In re Flores*, 535 B.R. 468, 486 (Bankr. D. Mass. 2015).

In addition to willfulness, the creditor must prove that the injury was malicious. An injury is malicious "if it was wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill-will." *In re Levasseur*, 737 F.3d 814, 818 (1st Cir. 2013) citing *Printy v. Dean Witter Reynolds, Inc.,* 110 F.3d 853, 859 (1st Cir. 1997) (internal citations omitted.) The injury must have been committed in "conscious disregard of one's duties." *Id.*

Summarizing the foregoing, to prevail under Section 523(a)(6), a creditor must show that: "(1) the creditor suffered an injury; (2) the injury was the result of the debtor's actions; (3) the debtor intended to cause the injury or there was a substantial certainty the injury would result from the debtor's act; and (4) the debtor had no just cause or excuse for the action resulting in injury." *Tacason, d/b/a Cutting Edge Sports*, 537 B.R. 41, 50 (B.A.P. 1st Cir. 2015) (citations omitted.)

**FINDINGS OF FACT**

The following findings of fact are based on the testimony of the witnesses through affidavits and testimony at trial, the exhibits submitted at trial, and the agreed upon facts in the Joint Pretrial Memorandum. The Court has not included facts or background that are not relevant to this decision. The Court has also not reconciled minor discrepancies, unless material or relevant to the rulings.

Commencing around 2002, the Debtor began working at International Cable Corporation ("ICC") a business owned by Jeffrey Fruman. ICC was involved in the business of refurbishing

and reselling new and used cable equipment including to Latin America and South America. ICC had offices in Massachusetts but moved operations to Miami and Central America. Jeffrey Fruman also owned additional businesses in the same field known as International Cable Colombia and International Cable Panama (one or both of which was sometimes referred to as International Cable Latam), which operated in Miami and Central America.

Over the next several years, the Debtor continued to work with Jeffrey Fruman and became more actively involved in the businesses. She worked at the offices in Avon, Massachusetts. The Debtor considered herself the "personal assistant" of Jeffrey Fruman. She was involved in both his businesses and his personal life, including family matters. She considered herself a good friend of Jeffrey Fruman and knew his family well.

The Plaintiff, at that time known as Paula Torres, met Jeffrey Fruman sometime before 2005. She was a native of Colombia, living in Dominican Republic and working as a model and in television. In 2007, the Plaintiff began working for ICC and the related companies.

At some point prior to 2008, the Plaintiff and Jeffery Fruman became romantically involved. Jeffrey Fruman had previously been married to Sara Fruman, with whom he had four children. In 2008, the Plaintiff moved to the United States and began living with Jeffrey Fruman. She came to the United States on a tourist visa and subsequently remained under a fiancé visa. The Plaintiff did not become a citizen of the United States until 2015.

The Plaintiff married Jeffrey Fruman in March 2010. The Plaintiff and the Debtor became friends and remained friends until shortly after Jeffrey Fruman's death in 2013.

In 2008, Jeffrey Fruman sought to establish JTE as a new business to provide services and testing of cable equipment, not sales. To take advantage of benefits for a woman owned business, Jeffrey Fruman proposed that the Debtor be the president and principal owner of the

8

business. JTE was formed with the Debtor as 60% owner, another colleague, Timothy Bradley, as a 25% owner, and Jeffrey Fruman as a 15% owner. No payments were made for the stock ownership.

JTE's operations were based at a warehouse in California, supervised by Bradley. The principal customer of JTE was Comcast, which accounted for 90% of the business. Bradley was responsible for the connection with Comcast. Bradley supervised the warehouse facility in California.

The Debtor received a salary and commission from JTE. The Debtor did not receive any distributions on the stock, although distributions to her were shown on the tax returns of JTE. During the period of 2008 through 2013, JTE would reimburse the Debtor for any tax liability for the distributions shown on the tax returns.

Jeffrey Fruman received payments from JTE including for personal expenses. Although the Debtor was the president, she acted based on instructions from Jeffrey Fruman. Nicholas Fleming, the attorney for JTE, required information from both the Debtor and Jeffrey Fruman before acting with respect to JTE.

The Plaintiff was involved primarily in sales in Latin America for ICC and the other companies, but not JTE. Although she did not work for JTE, the Plaintiff received payments from JTE. The Plaintiff initially received $4,000 every two weeks and subsequently received $5,000 every two weeks.

In December 2010, the Debtor transferred her stock ownership to the Plaintiff. The parties executed a stock agreement reflecting the transfer. Although the agreement stated consideration of $8,000, the Plaintiff did not pay any amount to the Debtor. At the same time, Jeffrey Fruman also transferred a portion of his shares to the Plaintiff and the remainder of his

9

shares to Bradley. The Plaintiff considered the transfer of the stock a gift from both her husband and the Debtor. As a result of the transfers, the Plaintiff owned 65% of the stock of JTE and Bradley owned 35% of the stock of JTE.

After the stock transfer, the Plaintiff was appointed as a director and president of JTE. Despite the vote, the Debtor continued to act as president and was responsible for the day-to-day management of JTE. The Plaintiff had no active role in management of JTE.

In 2011, Comcast required that JTE become formally certified as a woman owned business. In January 2012, the Supplier Clearinghouse of the California Public Utilities certified that JTE was a "WBE", or woman owned business enterprise. No evidence was submitted that JTE was certified as a minority owned business as well.

In early 2012, the Plaintiff and Jeffrey Fruman encountered marriage difficulties. The Plaintiff separated from Jeffrey Fruman and returned to Colombia. During the separation, on March 5, 2012, Jeffrey Fruman instructed the Debtor not to make any payments to the Plaintiff. The Debtor forwarded the email to the Plaintiff later that morning. In an email the following day, March 6, 2012, the Debtor encouraged both the Plaintiff and Jeffrey Fruman to reconcile. The Debtor made the travel arrangements for the Plaintiff and Jeffrey Fruman to meet in Colombia and sent an email to the Plaintiff with the details.

The Plaintiff and Jeffrey Fruman met in Colombia in March 2012. Shortly after the meeting, they reconciled and the Plaintiff returned to the United States. After the reconciliation, Jeffrey Fruman transferred his house in Massachusetts into the Plaintiff's name.

Evidence was presented that there were business reasons for the transfer of the stock of JTE from the Plaintiff to the Debtor. During 2012, Jeffrey Fruman wanted JTE to seek a contract with Telemex, a Colombian company. Because of prior litigation with the owners of Telemex,

10

Jeffrey Fruman wanted to remove the Fruman name to enable JTE to make the bid. The stock transfer to the Debtor was intended to permit JTE to make the bid. The Debtor also testified that additional requirements were needed to maintain the woman owned business designation of JTE for the work with Comcast. The owner was required to be active in the management of the company and be a United States citizen. Since the Plaintiff was not a citizen of the United States at the time and was not active in management, the transfer of stock was intended to address these issues.

On March 5, 2012, the Debtor asked Fleming to prepare a stock transfer agreement to transfer the stock owned by the Plaintiff in JTE to the Debtor. Fleming prepared the documents, which were dated as of February 18, 2012. Fleming sent an email to Jeffrey Fruman, the Debtor, the Plaintiff and Bradley to vote in favor of the transfer. An email was sent from the Plaintiff's account stating that she agreed to the transfer. The stock transfer agreement was executed. After receiving the email and execution of the stock transfer agreement, Fleming prepared appropriate recordings to file with the Secretary of the Commonwealth.

The stock transfer agreement provided that the Plaintiff would pay $8,000 for the stock to the Debtor. No payment was ever made for the stock. After the transfer, the Debtor continued to act on behalf of JTE at the direction of Jeffrey Fruman.

The Plaintiff testified that she did not send the email assenting to the transfer of stock. She testified that her husband sent the email without her knowledge during their meeting in Colombia and before they reconciled.

In June 2012, JTE agreed to buy the shares of Bradley in exchange for a payment of $227,000, including an immediate payment of $100,000, with two subsequent payments of $63,500. Bradley also agreed to sign a noncompete agreement.

11

Around the same time, Jeffrey Fruman asked the Debtor to obtain a line of credit for JTE from Webster Bank. After the loan was initially denied, Jeffrey Fruman decided to have the stock transferred to his name, in order that his financial income and assets could be considered for the loan. Consequently, Jeffrey Fruman and the Debtor executed another stock transfer agreement for the Debtor to sell her shares of stock in JTE to Jeffrey Fruman for $10,000. As with other stock transfers, no payment was made at the time for the stock.

In connection with the transfer, Jeffrey Fruman sent a separate email to the Debtor outlining his proposal regarding her compensation and incentives from JTE. The email also set forth the payments to Jeffrey Fruman and the Plaintiff that JTE would be required to continue to make. The Debtor did not agree to the email and its terms since she believed the payments to the Frumans were unrealistic.

After the transfers, the Debtor continued to act as president and manage JTE as requested by Jeffrey Fruman. Payments continued to be made to Jeffrey Fruman and the Plaintiff at the same rate.

In November 2012, Jeffrey Fruman gave the Debtor a check for $10,000. At the time, the Debtor believed that the payment was her year end bonus. The check had a memo endorsement that stated it was for the stock purchase of JTE.

On March 12, 2013, Jeffrey Fruman died suddenly in Hong Kong. The Debtor called the Plaintiff, who was with family in Colombia, and the Plaintiff returned to the United States. Under Jeffrey Fruman's will, Jay Pabian, an attorney, and Todd Kamens, a cousin, were appointed to collect and manage the assets of his estate.

The Plaintiff testified that the Debtor came to her home when she returned. The Plaintiff testified that the Debtor stated she had participated in transferring the stock in early 2012 out of

12

the Plaintiff's name (i) to enable JTE to open the business in Colombia, and (ii) to protect Jeffrey Fruman in the event the Plaintiff divorced him. The Debtor denied the conversation.

Shortly after the meeting with the Debtor, the Plaintiff met with Pabian regarding the estate. Although they discussed the issue of ownership of JTE, the Plaintiff did not mention the conversation with the Debtor. During the course of her discussions with Pabian, the Plaintiff acknowledged that the stock was put in the Debtor's name because of the issue with the bid in Colombia.

The sudden death of Jeffrey Fruman caused considerable disruption for the businesses and his family members. Disputes arose among the estate managers for Jeffrey Fruman, Sara Fruman, the Plaintiff and the Debtor. In April 2013 there was a major confrontation at the offices in Avon with shouting and hostile words among the Plaintiff, the Debtor, and others.

There were also disputes over the ownership of JTE among the estate of Jeffrey Fruman, the Plaintiff, and the Debtor. Based on the transfer in June 2012, the estate asserted that Jeffrey Fruman owned the stock of JTE. The Plaintiff and Sara Fruman filed documents with the Secretary of the Commonwealth seeking to remove the Debtor as an officer and director of JTE. In June 2013, a lawyer representing the Debtor advised that the Debtor claimed ownership of JTE. The demand letter asserted that the Debtor would take action against the Plaintiff and Sara Fruman if they continued to interfere. At the time, the Debtor was unaware of the endorsement on the check given in November. She believed that Jeffrey Fruman had failed to pay her for the stock. After learning of the endorsement on the check, the Debtor stopped making claims of ownership of JTE.

During this period, the Debtor continued to manage JTE but sought instructions from Pabian and Kamens as the managers of the estate of Jeffrey Fruman regarding various matters.

13

JTE also encountered financial difficulties. Because of the disputes over its ownership, JTE was unable to obtain financing for the operations. In addition, Comcast ended the contract during 2013 which was the principal source of business of JTE. The Plaintiff continued to receive payments from JTE, however, the payments stopped sometime after April 2013. The estate managers directed the Debtor to cease making payments to the Plaintiff. In addition, as discussed above, JTE was facing financial problems at that time.

In early June 2013, the Debtor gave notice to Pabian and Kamens as managers of Jeffrey Fruman's estate that she intended to resign at the end of June. She later chose not to resign but instead entered into a management agreement with the estate mangers and JTE. The Debtor believed that because of her active role as president she was facing liability for the debts of JTE. She continued to manage JTE at the direction of the estate representatives until 2014.

On June 24, 2013, the Debtor formed another corporation, JFK Communications LLC, to engage in the buying and selling of telecommunications equipment. JFK stood for Jeffrey Fruman's kids. No evidence was presented that JFK competed with JTE or sought business from customers of JTE.

In 2013, the Plaintiff commenced litigation against the Debtor, Jay Pabian, his law firm, and other defendants entitled *Paula Fruman v. Jay Pabian et al.*, Civil Action No. 1384CV02976, pending in the Suffolk Superior Court of the Commonwealth of Massachusetts. ("State Court Litigation"). In the State Court Litigation, the Plaintiff alleged that the Debtor breached a contract with Jeffrey Fruman to make payments to the Plaintiff and Jeffrey Fruman, and the Plaintiff was a third party beneficiary. The Plaintiff also alleged that the Debtor breached her fiduciary obligations as an officer and director of JTE to the Plaintiff as a shareholder. Finally, the Plaintiff alleged that the Debtor intentionally inflicted emotional harm on her by the

14

Debtor's actions after the death of Jeffrey Fruman and by the Debtor's claim of ownership of JTE.

The Plaintiff settled with the other defendants in the State Court Litigation. A jury trial was held on the remaining claims against the Debtor. The Debtor represented herself at trial. After trial, the jury found that the Debtor had breached the contract with Jeffrey Fruman and the Plaintiff was entitled to $360,000 as a third-party beneficiary. The jury also found that the Debtor had breached her fiduciary duties to the Plaintiff and the Plaintiff was entitled to $10,000 in damages. Finally, the jury found against the Plaintiff on the claim of intentional infliction of emotional harm and granted judgment to the Debtor on that count.

### ANALYSIS

As more fully discussed below, the Plaintiff has failed to meet her burden of proof that the debt owed by the Debtor is nondischargeable. The Plaintiff failed to show by the preponderance of evidence that the Debtor made false representations or engaged in actual fraud in connection with the transfer of the Plaintiff's stock in JTE to the Debtor in March 2012. The Plaintiff failed to show that the Debtor caused the decline of JTE or took actions with conscious disregard of her duties or a willful blindness that the conduct violated her fiduciary duties. Finally, the Plaintiff failed to demonstrate by a preponderance of the evidence that the Debtor took actions with the intent to injure the Plaintiff in connection with the decline of JTE or the failure to make payment to the Plaintiff from JTE.

#### Section 523(a)(2) Claims

The Plaintiff has failed to sustain her burden under Section 523(a)(2) that the Debtor participated in actual fraud or made fraudulent representations connection with the transfer of the Plaintiff's stock to the Debtor. The Plaintiff claims that she did not send the email authorizing

15

the transfer of her stock. But the Plaintiff failed to show by a preponderance of the evidence that the Debtor knew that the email was false. The only evidence offered was testimony by the Plaintiff regarding the alleged conversation with the Debtor in March 2013, shortly after Jeffrey Fruman died. The Debtor disputes the conversation. The Plaintiff never disclosed the conversation in her discussion with Jay Pabian a few days later, despite discussing JTE and its ownership. Absent corroboration, such testimony alone is insufficient to meet the Plaintiff's burden.

To the contrary, the course of dealings between the Debtor and the Plaintiff during this period supported a belief by the Debtor that the email was sent by the Plaintiff. The Debtor regularly communicated with the Plaintiff by email during this period regarding business and personal matters. For example, the Debtor sent the Plaintiff an email to advise her that Jeffrey Fruman directed no further payments be made to the Plaintiff during their separation. The Debtor also sent an email urging the Frumans to reconcile. Finally, the Debtor made the travel plans for the Frumans to meet and sent the instructions to the Plaintiff by email. There was no evidence that the Plaintiff advised the Debtor that she did not receive or use email during this period.

The Plaintiff has also failed to show there was any fraudulent intent by the Debtor in connection with the transfer of the stock. The evidence showed business reasons for the transfer. The Plaintiff acknowledged that the stock was transferred out of the name of the Frumans to the Debtor to enable JTE to pursue an opportunity in Colombia. In addition, there was evidence that to maintain the benefits of a woman owned business, the owner must be active in management and a citizen of the United States. The Plaintiff was not a United States citizen at the time and had no active role in the management of JTE.

In addition, the transfer of the stock did not change the relationship among the parties

16

relating to JTE. JTE continued to be managed for the benefit of Jeffrey Fruman and his family, not the Debtor, regardless of who was shown as stockholders. Jeffrey Fruman and the Plaintiff continued to receive payments whether or not the stock was in their names at the time. While stock transfers were documented, the majority involved no payment. No payment was made for the original stock acquisition. As the Plaintiff acknowledged, no payment was made when the Plaintiff acquired stock in JTE in December 2010. Instead, the Plaintiff considered the stock transfer from the Debtor a "gift," despite the terms of the agreement.

Except for her salary and the payment of $10,000 for the stock in November 2012, the Debtor did not received distributions from JTE or personally benefit from stock ownership. The Debtor never acted as owner contrary to Jeffrey Fruman and the Plaintiff. She continued to manage JTE at Jeffrey Fruman's instruction when he was alive, and the direction of his estate once he died. She continued to make payments to the Plaintiff throughout, until she was instructed not to make payments by the estate representatives.

Finally, although the Debtor was held out as owner or president of JTE from time to time, there was no evidence that the Debtor did so for her personal benefit. Such actions were taken to enable the company to benefit from the designation as a woman owned business. While the Plaintiff claims that her ownership as a minority was for similar business reasons, no evidence was presented that JTE was designated or held out as minority owned business. In addition, there was no evidence that the Plaintiff took any active role in the management of the business.

**Section 523(a)(4)**

The Plaintiff failed to show that the debt of the Debtor is nondischargeable under Section 523(a)(4) as a defalcation with the requisite "culpable state of mind," similar to embezzlement, fraud, and larceny. *Bullock v. BankChampaign, N.A.,* 569 U.S. 267, 269,

17

133 S. Ct. 1754, 1757 (2013). Although the jury in the State Court Litigation found a breach of fiduciary duty by the Debtor, such a finding alone is not sufficient to sustain a claim under Section 506(a)(4). The Plaintiff failed to show by a preponderance of the evidence that the actions by the Debtor were done with conscious disregard or willful blindness to a substantial risk that such conduct violated her fiduciary duty. See *In re Ackerman*, 587 B.R. at 786 (internal citations omitted.)

The Plaintiff failed to show by a preponderance of the evidence that the Debtor breached her fiduciary duty to the Plaintiff by destroying the business of JTE. To the contrary, the evidence showed that the Debtor sought to keep the business going, made decisions for business reasons, and acted at the direction of Jeffrey Fruman or his estate. The principal business of JTE was based on a contract with Comcast which was terminated. The evidence showed that JTE faced financial issues because of an inability to obtain funding or financing to continue other operations. The Plaintiff failed to provide any evidence that JTE could continue operations after the loss of the Comcast business.

The Plaintiff failed to show that any payments to the Debtor from JTE were improper or in violation of her fiduciary duty. Before and after Jeffrey Fruman's death, the Debtor received no distribution or funds from the company except her salary. The evidence showed that the Debtor provided regular services to JTE to earn the salary. After Jeffrey Fruman's death, the salary was negotiated with the estate representatives as part of the management contract.

The Plaintiff also failed to show by a preponderance of the evidence that the failure of the Debtor to make payments to the Plaintiff constituted a "defalcation" with the requisite intent under Section 523(a)(4). The payments to the Plaintiff ceased because of the financial condition of JTE. In addition, the Debtor acted at the direction of the managers of the estate of Jeffrey

Fruman. The Plaintiff did not rendered services for JTE and was not a creditor of JTE. The payments appear to be in the nature of equity distributions. Paying creditors before making any distributions in the nature of equity distributions fails to demonstrate reckless disregard of a fiduciary duty.

**Section 506(a)(6)**

The Plaintiff also failed to demonstrate by a preponderance of the evidence that the Debtor acted with the requisite "willful and malicious" intent to injure the Plaintiff. To the contrary, the evidence showed that the Debtor acted at the instructions of Jeffrey Fruman and for the benefit of the Frumans.

The Plaintiff claims that the Debtor's assertion of ownership after Jeffrey Fruman's death was "willful and malicious." But the Plaintiff fails to offer any evidence that such claim was done with the intent to injure the Plaintiff. After the Plaintiff sought to remove the Debtor from JTE, the Debtor consulted an attorney. The attorney raised the claim of ownership in a letter. The Court credits the Debtor's testimony that she believed that Jeffrey Fruman had not made the payment for the stock. The Debtor was unaware of the notation on the check given by Jeffrey Fruman until it was brought to her attention. After learning of the notation, the Debtor ceased making any further ownership claim. The Plaintiff failed to provide any evidence that the brief claim of ownership by the Debtor during this period was done with the intent to injure the Plaintiff or that any debt arose from such actions.

The Plaintiff also claims that the Debtor "willfully" and "maliciously" caused intentional injury to the Plaintiff by allegedly destroying the business of JTE and failing to make the payments to the Plaintiff. As discussed above, the Court credits the Debtor's testimony that JTE failed due to financial problems. The Court also finds that JTE had insufficient finances to make

19

the payments to the Plaintiff. Finally, as discussed above, the Debtor acted at the instructions of the estate managers to cease the payments. Given the evidence, the Plaintiff has failed to sustain her burden of proof that such actions of the Debtor were done with the "willful and malicious" intent to injure the Plaintiff.

**CONCLUSION**

For the foregoing reasons, the Court finds that the Plaintiff has failed to sustain her burden of proof that the debt owed by the Debtor was nondischargeable under Section 523(a)(2), Section 523(a)(4), or Section 523(a)(6) of the Code.

The Court will enter judgment in favor of the Debtor consistent with this decision.

Dated: October 2, 2025

By the Court,

Janet E. Bostwick
United States Bankruptcy Judge

20